MARK A. COLEMAN                                    CIVIL ACTION

VERSUS                                             NO. 12-906

ROBERT C. TANNER ET AL.                            SECTION "A" (2)

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff, Mark A. Coleman, is a prisoner currently incarcerated in the Rayburn Correctional Center ("Rayburn") in Angie, Louisiana. He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against Rayburn Warden Robert C. Tanner, Warden Steve Rader of Dixon Correctional Institute and Warden Allemand of Allen Correctional Center. Just as he alleged in a similar suit filed and dismissed in this court three years ago, <u>Coleman v. Tanner</u>, C.A. No. 09-7346 "I"(2), Coleman again asserts that he is being denied "the same privileges as the rest of general population" and that "I feel my life may be in danger" because of his past cooperation with prison officials that resulted in the prosecution of several state corrections officers. He seeks injunctive relief in the form of transfer to another facility and witness protection. Record Doc. No. 1 (Complaint at ¶s IV and V).

Coleman supplemented his complaint with a motion for preliminary injunction and statement of facts reiterating his requests to be "transferred to a more safer (sic) environment" because of the "risk" posed by his past cooperation in the prosecution of

correctional officers, Record Doc. No. 4 at p. 2; "to stop the ongoing poisoning of my food while I'm housed in . . . maximum custody," Record Doc. No. 12 at p. 2; and "[b]ecause I've been attacked once already in (sic) sustained injuries [to] my elbow, . . . threaten[ed] to be killed by other offenders continuously . . . [and] written up and placed on cell confinement since November 2011 because I've continued several request[s] for protection . . ." Record Doc. No. 17 at p. 2.

On June 19, 2012, I conducted a telephone conference in this matter. Participating were plaintiff pro se; Jonathan Vining and Joey Pousson, counsel for defendants. Plaintiff was sworn and testified for all purposes permitted by <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985), and its progeny.

## <u>THE RECORD</u>

In 2009, Coleman filed Civil Action No. 09-7346 "I"(2) against Rayburn Warden Robert C. Tanner, Deputy Warden Keith Bickham and Classification Director Lynn McCloud in this court. He alleged that prison officials failed to protect him from attack by another inmate, Daryl Toney, who injured his arm and elbow. He also alleged that defendants were holding him in disciplinary confinement in retaliation for his requests for assistance, protection and transfer to another facility because of his past cooperation in the prosecution of correctional officers.

Civil Action No. 09-7346 was dismissed with prejudice as legally frivolous and otherwise for failure to state a claim upon which relief may be granted , Record Doc. No. 22 (Judgment in Civil Action No. 09-7346), and his state law claims were dismissed without prejudice.

During the conference conducted in the instant case on June 19, 2012, Coleman confirmed that he remains incarcerated in Rayburn based upon the same 2006 conviction for distribution of cocaine, resulting in a 20-year prison sentence, that was the basis for his incarceration during his previous lawsuit. He confirmed that in the instant lawsuit he seeks transfer from Rayburn to another prison facility, though not necessarily to the jail in his home town of Houma, Louisiana. Coleman stated that he would accept transfer to any other facility that would constitute "a more safer environment."

Coleman also acknowledged that he had filed the earlier, similar lawsuit in this court that was dismissed two years ago involving the same kinds of complaints and seeking similar relief. Asked what circumstances had changed since his similar complaint asserting the same kinds of claims was dismissed in May 2010, Coleman stated that "more problems have occurred since then." Asked what problems had occurred, Coleman said, "I had to request protection on several occasions . . . because I have been labeled a confidential informant, by inmates that's (sic) coming into this institution from Dixon Correctional Institution and Allen Correctional Institution, where two officers were

arrested and placed in custody and received jail time for introduction of contraband into a penal institution involving me. . . . I testified . . . against those officers. . . . I assisted the state police in helping put them in jail." Coleman confirmed that all of these things occurred before May 2010, when his prior lawsuit was dismissed. The record of this court in his prior lawsuit, confirms that the same facts were raised and considered at that time.  C.A. No. 09-7346 "I"(2), Record Doc. No. 20.

Thus, Coleman was asked to focus his current testimony on events that had occurred since that time. He stated, "Since that happened, I have requested several protection situations based on inmates threatening my life, . . . labeling me as a confidential informant . . . for the state, and I've also had problems out of security here that's labeling me as a confidential informant, and it just continues to go on and on and on." Coleman testified that several inmates, including Daryl Toney, the same person whose attack on him in May or June 2008 was one of the subjects of his dismissed prior lawsuit, had threatened him.  Coleman complained that Toney and he are "not supposed to be around each other," but they are both nevertheless housed in "Sun Unit, it's like a maximum custody, but we all go out on the rec (sic) yard together." Coleman said that Sun Unit is a stricter security, more restricted area than the general prison population, where he was being housed at the time his previous lawsuit was dismissed.

Coleman testified that he is now being housed in this more restrictive area "because when I requested protection, they put me here. This place don't have what you would call an actual protective custody where you gonna be housed and have the same stipulations as general population, so they throw me in protection, which is administrative segregation, and being here in administrative segregation, that's the only thing they have here to offer me" as a response to his requests for protection. He described his current housing unit as a "maximum security facility." He stated that he had been in the maximum security area since June 2008, and he was released from maximum security in February 2011, but "the problem got so bad I had to come back November of last year (2011)."

Coleman testified that "they kept writing me up" because he kept bringing complaints to the warden telling him that he was receiving murder threats from other inmates while in the general prison population, "but I don't want to give up my rights of being in general population."

Coleman complained that "you stay here [in the maximum security area] for 90 days, and then they look at your record to see if you go back to [general] population. If you don't receive no rule infractions or writeups and stuff, they can put you back in [general] population, but that's not my case. . . . The officials here know that it's a possibility that if I do get put back in [general prison] population, that I could get hurt,"

so he is asking prison officials for a protective custody living situation that also allows him to enjoy the privileges of living in the general prison population that are not available in the Sun Unit maximum security area. Coleman complained that "they keep writing me up every 90 days" to keep him in maximum security. He admitted, however, that in the general prison population, there is a risk that he would be hurt by other inmates based upon the threats he has received.

Plaintiff summarized that his complaint in this case is that he has been threatened and that he constantly receives disciplinary write-ups for rule infractions that keep him in the maximum security unit. On cross-examination, Coleman confirmed that he has not been in Allen Correctional Center since 2007.

After the telephone conference, Coleman filed an "Emergency Request," apparently in support of his earlier filed motions for preliminary injunction. Record Doc. No. 20. In that request, he specified that "there's no sort of money damages in this matter that's because it's not about that . . . ." Id. at p. 5. He alleged that he is sick, suggested that he is being poisoned in the jail, and requested that the court "investigate through technology 'blood work' to determine if any poisons were administered and how long it's been in the liver." Id. at p. 6. These same kinds of allegations concerning poisoning and resulting sickness were asserted and rejected in his prior lawsuit. C.A. No. 09-7346 "I"(2), Record Doc. No. 20 at pp. 20-23.

# ANALYSIS

The purpose of a <u>Spears</u> hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims. <u>Spears</u>, 766 F.2d at 180. "[T]he <u>Spears</u> procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." <u>Davis v. Scott</u>, 157 F.3d 1003, 1005 (5th Cir. 1998). The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). <u>Wilson v. Barrientos</u>, 926 F.2d 480, 481 (5th Cir. 1991); <u>Adams v. Hansen</u>, 906 F.2d 192, 194 (5th Cir. 1990). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." <u>Spears</u>, 766 F.2d at 182.

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous <u>or</u> <u>malicious</u>.'" <u>Moore v. McDonald</u>, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended)(emphasis added). A complaint is frivolous "if it lacks an arguable basis in law or fact." <u>Davis v. Scott</u>, 157 F.3d 1003, 1005 (5th Cir. 1998); <u>Reeves v. Collins</u>, 27 F.3d 174, 176 (5th Cir. 1994).

Duplicative and repetitive lawsuits are malicious for purposes of 28 U.S.C. § 1915(e)(2)(B)(i) and must be dismissed for that reason. <u>Potts v. Texas</u>, No. 08-41177,

2009 WL 3806073, at *1 (5th Cir. Nov. 13, 2009) (citing <u>Pittman v. Moore</u>, 980 F.2d

994, 994-95 (5th Cir. 1993); <u>Bailey v. Johnson</u>, 846 F.2d 1019, 1021 (5th Cir. 1988)).

  Courts may appropriately dismiss an in forma pauperis action as frivolous, when the action "seek[s] to relitigate claims which allege substantially the same facts arising from a common series of events which have already been unsuccessfully litigated by the in forma pauperis plaintiff." . . . In <u>Pittman</u>, the Fifth Circuit Court of Appeals noted that <u>Wilson [v. Lynaugh]</u> "essentially held that pauper status does not entitle a plaintiff to avoid the ordinary rules of res judicata." The Circuit then agreed that a complaint is malicious when it "duplicates allegations of another pending federal lawsuit by the same plaintiff." Reading <u>Pittman</u> and <u>Wilson</u> in conjunction, it is clear that the Court may dismiss an action as malicious when the complaint raises claims that would be barred by the principles of res judicata, whether or not the prior litigation has ended unsuccessfully for the plaintiff.

  It is well-settled that "res judicata bars all claims that were brought or could have been brought based on the operative factual nucleus." A complaint is thus malicious when it "duplicates allegations of another pending federal lawsuit by the same plaintiff" or when it raises claims arising out of a common nucleus of operative facts that could have been brought in the prior litigation.

<u>McGill v. Juanita Kraft Postal Serv.</u>, No. 3:03-CV-1113-K, 2003 WL 21355439, at *1-2

(N.D. Tex. June 6, 2003) (Ramirez, M.J.) (quoting <u>Wilson v. Lynaugh</u>, 878 F.2d 846, 850

(5th Cir. 1989); <u>Pittman</u>, 980 F.2d at 994, 994-95; <u>Ellis v. American Express Life Ins.

Co.</u>, 211 F.3d 935, 938 n.1 (5th Cir. 2000)), <u>report & recommendation adopted</u>, 2003 WL

21467745 (N.D. Tex. June 18, 2003) (Kinkeade, J.); <u>accord</u> <u>Parker v. Fort Worth Police

Dep't</u>, 980 F.2d 1023, 1026 (5th Cir. 1993).

In this case, Coleman is attempting to reassert the same claims that have already been asserted and rejected in his earlier filed case in this court. The injury to his arm resulting from the 2008 attack by inmate Daryl Toney, his need and requests to be housed in a secure area because of his past cooperation in the prosecution of correctional officers, the concomitant reasons for his inability to be housed in the prison's general population, the alleged poisoning of his food resulting in claims of illness, his desire to be transferred to another prison facility, and the claim that he is being subjected to disciplinary writeups as a basis for keeping him in maximum security – when he concedes that it is being done instead as a response to his requests for protective custody, were all raised, addressed and rejected in his prior lawsuit. Coleman v. Tanner, C.A. No. 09-7346 "I"(2), Record Doc. Nos. 20-22. His allegations that he has been labeled as an informant, which was also made in his prior lawsuit, with the result that he continues to hear threats from other inmates, provides no basis for a new claim; since "in the Eighth Amendment context, 'mere threatening language or gestures . . . do not, even if true, amount to constitutional violations.'" Robertson v. Plano City, 70 F.3d 21, 24 (5th Cir. 1995); Watson v. Winborn, No. 02-10984, 67 Fed. Appx. 241, 241 (5th Cir. 2003); Calhoun v. Hargrove, 312 F.3d 730, 734 (5th Cir. 2002); Vessell v. Gusman, No. 06-2294, 2006 WL 2067723, at *2 (E.D. La. July 19, 2006) (McNamara, J.) (citing Calhoun, 312 F.3d at 734; Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997); Bender v.

9

Brumley, 1 F.3d 271, 274 n.4 (5th Cir. 1993)).  As in his prior lawsuit based largely on these same circumstances, the fact that the kind of maximum security arrangement available at Rayburn as a response to his requests for protection does not enable him to enjoy the same kinds of privileges available to inmates in general population, provides no basis for the injunctive relief Coleman seeks in this reprisal of his earlier lawsuit.  For all of the foregoing reasons, his current complaint must be rejected in this case as duplicative and malicious.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that plaintiff's complaint be **DISMISSED WITH PREJUDICE** as duplicative and malicious pursuant to 28 U.S.C. § 1915(e)(2)(B)(i). For ease of reference, a copy of the report and recommendation, adopted by the court, that supports the judgment of dismissal in his previous case, C.A. No. 09-7346 "I"(2), Record Doc. No. 20, is attached for filing in this record.

For the same reasons, it is **RECOMMENDED** that his motions for injunctive relief, Record Doc. Nos. 4 and 12, be **DENIED.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of

plain error, from attacking on appeal the unobjected-to proposed factual findings and

legal conclusions accepted by the district court, provided that the party has been served

with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[1]

New Orleans, Louisiana, this ____13th____ day of July, 2012.


_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[1]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective
December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MARK A. COLEMAN                                        CIVIL ACTION

VERSUS                                                        NO.  09-7346

ROBERT TANNER ET AL.                              SECTION "I" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Mark A. Coleman, is a prisoner currently incarcerated in the B.B. "Sixty" Rayburn Correctional Center ("Rayburn") in Angie, Louisiana.  He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against Rayburn Warden Robert C. Tanner, Deputy Warden Keith Bickham and Classification Director Lynn McCloud.  He alleges that prison officials failed to protect him from attack by another inmate and imposed disciplinary action against him in retaliation for his requests for assistance, protection and transfer to another facility.  His written complaint also asserts state law claims of assault, battery and negligence.  He seeks declaratory and injunctive relief, monetary compensation and transfer to another facility.  Record Doc. No. 1 (Complaint).

On February 23, 2010, I conducted a telephone conference in this matter. Participating via telephone were plaintiff pro se; Phyllis Glazer and Michael Keller,

counsel for defendants.  Plaintiff was sworn and testified for all purposes permitted by
Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

## THE RECORD

Coleman testified that he is currently incarcerated in Rayburn based upon a
conviction for distribution of cocaine on March 8, 2006, for which he is serving a prison
sentence of 20 years.  He stated that his claims in this case arise from the period of time
during which he has been incarcerated in Rayburn.  He confirmed that all of the named
defendants are employed at Rayburn and that he asserts four kinds of claims in this case.

He stated that his first claim is that he has not been protected from harm while
incarcerated in Rayburn and that this claim arises originally from an attack by another
inmate in May or June 2008.  He identified the inmate who attacked him as Ty Darryl
Toney.  Coleman testified that he had been transferred to Rayburn based upon two earlier
incidents that happened in other facilities in which correctional officers were arrested for
misconduct. He testified that he "kinda had a bad record behind me . . . saying that I was
a confidential informant and all this, . . . so when I got here to this facility, it didn't take
but maybe five to six months for it to really get out."

Coleman stated that he was transferred to Rayburn in January 2008 from Dixon
Correctional Institute.  He said that when he arrived at Rayburn, "rumor got out" that he
had cooperated with Louisiana Department of Corrections ("DOC") officials in

connection with their investigation of wrongdoing by correctional officers at other facilities.  He said that other inmates at Rayburn, some of whom had been incarcerated with him at Dixon, knew about what had taken place at the other facilities.  Coleman said that Ty Darryl Toney was <u>not</u> one of those inmates, "he was here [at Rayburn] already. The only part he played was . . . they [other inmates] kinda like used him . . . basically to make the attack."  Coleman clarified that his claim in this case is that other inmates provoked Toney to attack him.

Coleman stated that the attack occurred sometime in May or June 2008. He acknowledged that he had received a copy of his medical records that I previously ordered, Record Doc Nos. 6 and 10, that he had reviewed them and that they are accurate. He confirmed the indication in the medical records that on May 15, 2008, he requested medical treatment for injuries suffered in a fight, and he confirmed that this was about the time of the attack by Toney.  He also acknowledged the reference in the medical records that a nurse saw him shortly afterwards for injuries suffered in the fight, including an infected bump on his elbow that a doctor had to drain.

Coleman said his claim is related both to the attack by Toney and his entire "situation," as described in the extensive papers he has filed.  He testified that after he was attacked by Toney, he was placed in "administrative lockdown."  He confirmed the allegations in his written submissions that, after he was attacked by Toney, other inmates

3

threatened him while he was in "administrative segregation," but he was not attacked again.  He said that other inmates told him that "other inmates was after me" because of "the confidential informant stuff."  He said, however, that he had <u>not</u> been harmed again by other inmates since the May or June 2008 attack by Toney, after "I was placed in lockdown," and that he is "still in lockdown."

Coleman described his current incarceration status as a punishment area.  He said that his requests to be placed in some sort of protective custody had been denied because, after they spoke to Toney and other inmates, prison officials found his claim to be "without merit" and told him that they saw no need for protective custody.  "They didn't see where my life was in danger, and they just placed me in a maximum security working cell block," which he complained does not "cut [him] away from the general [prison] population. . . .  It's not like you're really safe."  He conceded again, however, that since he was placed in this different classification after the attack by Toney, he had <u>not</u> been attacked again.

As to his claim that he was subjected to disciplinary action in retaliation for his request for assistance, Coleman explained that, because of his cooperation in the actions taken against correctional officers at two other facilities, "I feel like it took a toll on some of the correctional officers here."  He would not discuss this claim during the hearing and requested that he be allowed to submit information to the court concerning this claim

following the hearing.  He said only "here you got a man, a prisoner that . . . got some security officers caught up in drugs, criminal wrongdoing."  Asked if he had been physically harmed, he said, "not really, I mean like I say, there are some things I just cannot discuss on the phone."  He asked for permission to submit the information concerning his retaliation claim to me in writing, and I permitted him to do so on or before March 23, 2010.

Coleman testified that, a few weeks before the telephone conference in early 2010, he was moved from administrative segregation, where he had stayed for almost 17 months after the attack by Toney, to a working cell block area.  He stated that his complaint is not about having been placed in administrative segregation or about his transfer from administrative segregation to the working cell block, but that he should be transferred away from the Rayburn facility altogether "because of protection concerns" based on his earlier cooperation with the DOC.  He clarified his claim as follows: he wants to be transferred to another prison facility for reasons related to his prior cooperation with DOC officials against correctional officers at other facilities.

Coleman stated that he does <u>not</u> assert claims in this case concerning assault and battery.  He clarified that his basic claims are that he was not protected from the attack by Toney after he brought his prior cooperation to the attention of prison officials and

that he wants to be transferred in light of the attack resulting from his cooperation and defendants' denial of his requests for protection.

After the hearing, Coleman submitted a written statement, signed under penalty of perjury, concerning his retaliation and transfer claims that he would not discuss during his testimony. Record Doc. Nos. 17 and 19. In general, those materials reiterate the basic allegations of his testimony that he is in danger because of his past cooperation with DOC officials concerning misconduct by correctional officers at other facilities and that defendants failed to protect him from Toney's attack. His supplemental submission adds an allegation that he had a sexual relationship with a female DOC officer at another facility, and reiterates the allegation in his original complaint that his food was poisoned while he was in administrative segregation at Rayburn. Record Doc. No. 19 at p. 3. His submission stresses that he seeks an order transferring him to a "safer environment," including possibly "federal protective custody." Id. at p. 4.

## ANALYSIS

### I.    STANDARDS OF REVIEW

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended). A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis

v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims. Spears, 766 F.2d at 180. "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." Davis, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326-27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504

U.S. 25 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable. "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents. A defendant may not use medical records to refute a plaintiff's testimony at a Spears hearing." Id. (citing Wilson, 926 F.2d at 482-83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)). However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'" Gobert v. Caldwell, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a Spears hearing, the complaint must be dismissed as legally frivolous if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176-77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff,

8

dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not."  <u>Moore</u>, 976 F.2d at 269.  A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's complaint must be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous because it lacks an arguable basis in law or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims. Plaintiff's complaint, as amended by his testimony at the <u>Spears</u> hearing, fails to state a claim under the broadest reading.[1]

## II.   <u>STATUTE OF LIMITATIONS/PRESCRIPTION OF ATTACK CLAIM</u>

To whatever extent, if any, that Coleman asserts a Section 1983 claim that defendants failed to protect him from the attack by inmate Toney, who was allegedly provoked by other inmates to attack him, that specific claim is barred by the applicable statute of limitations, or the concept of "prescription" under analogous Louisiana law. The district court may raise the limitations defense sua sponte in a suit filed in forma pauperis under 28 U.S.C. § 1915.  <u>Wilke v. Meyer</u>, 345 Fed. Appx. 944, 2009 WL 3150381, at *1 (5th Cir. 2009), <u>cert. denied</u>, 78 U.S.L.W. 3579 (2010); <u>Lopez-Vences</u>

---

[1]Pro se civil rights complaints must be broadly construed, <u>Moore</u>, 30 F.3d at 620, and I have broadly construed the complaint in this case.

v. Payne, 74 Fed. Appx. 398, 2003 WL 22047325, at *1 (5th Cir. 2003) (citing Gartrell

v. Gaylor, 981 F.2d 254, 256 (5th Cir. 1993)).

Although Section 1983 has no statute of limitations, the Louisiana prescription

statute is applicable to suits in federal court under Section 1983.

> Because there is no federal statute of limitations for § 1983 claims, the
> district court looks for comparison to the forum state's statute of limitations
> for personal injury claims.   In Louisiana, personal injury claims are
> governed by La. Civ. Code Art. 3492, which provides for a prescriptive
> period of one year from the date of injury or damage.

Duplessis v. City of New Orleans, No. 08-5149, 2009 WL 3460269, at *4 (E.D. La.

Oct. 26, 2009) (McNamara, J.) (citing La. Civ. Code art. 3492; Wallace v. Kato, 549 U.S.

384, 387 (2007); Wilson v. Garcia, 471 U.S. 261, 275 (1985); Jacobsen v. Osborne, 133

F.3d 315, 319 (5th Cir. 1998); Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994);

Elzy v. Roberson, 868 F.2d 793, 794 (5th Cir. 1989)).

Plaintiff's claim that defendants failed to protect from the attack by Toney is based

on an incident that occurred on or before May 15, 2008, according to the medical records

and plaintiff's testimony confirming those records, although Coleman also testified that

the attack occurred sometime in May or June 2008.  Thus, the last day of June, 2008 was

the latest date on which the attack could have occurred, and plaintiff had one year from

that date, or until June 30, 2009, within which to file suit.

The date when the clerk of court receives the complaint, rather than the formal filing date, usually establishes the time of filing in forma pauperis complaints.  Martin v. Demma, 831 F.2d 69, 71 (5th Cir. 1987).  However, in the pro se prisoner context, a "mailbox rule" applies, so that the date when prison officials receive the complaint from the prisoner for delivery to the court is considered the time of filing for limitations purposes.  Stevenson v. Anderson, 139 Fed. Appx. 603, 2005 WL 1367766, at *1 (5th Cir. 2005); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995); Douglas v. Gusman, 567 F. Supp. 2d 877, 885 (E.D. La. 2008) (Duval, J.).

In this case, the earliest date on which prison officials could have received Coleman's complaint for delivery to this court is October 24, 2009, when he signed it.[2] Record Doc. No. 1 (Complaint at p. 4).  Plaintiff's complaint is therefore considered to have been filed and this action commenced on October 24, 2009 for limitations purposes.

Federal law determines when a Section 1983 claim accrues.  Jacobsen, 133 F.3d at 319.

> For purposes of calculating the limitations period, a § 1983 cause of action accrues when the plaintiff knows or has reason to know of the injury which forms the basis of his action.  The Supreme Court has held that prescription begins to run at the point when "the plaintiff can file suit and obtain relief."

---

[2]The complaint was actually tendered to the Clerk of Court for filing in this court about three days later, on October 27, 2009.

11

Duplessis, 2009 WL 3460269, at *5 (quoting Wallace v. Kato, 549 U.S. 384, 388 (2007)) (citing Jacobsen, 133 F.3d at 319; Gonzales v. Wyatt, 157 F.3d 1016, 1020 (5th Cir. 1998)); accord Brown v. Nationsbank Corp., 188 F.3d 579, 589-90 (5th Cir. 1999); Piotrowski v. City of Houston, 51 F.3d 512, 516 (5th Cir. 1995).  Determination of when plaintiff knew or should have known of the existence of a possible cause of action has two factors:  "(1) [t]he existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions."  Id.

In addition to applying the forum state's statute of limitations, federal courts should give effect to any applicable tolling provisions provided by state law.  Lopez-Vences, 2003 WL 22047325, at *1; Gartrell, 981 F.2d at 257; Parks v. City of Slidell, No. 97-1993, 1998 WL 158952, at *4 (E.D. La. Apr. 1, 1998) (Clement, J.).

The running of prescription under Louisiana law may be suspended or tolled for equitable reasons, which have been expressed in the civilian legal principle of contra non valentem.  Under this theory, there are four situations in which the one-year prescriptive period for delictual actions will not run: (1) if there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action, (2) if there was some condition coupled with the contract or connected proceeding which prevented the creditor from suing or acting, (3) if the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause

12

of action, and (4) if the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Id. (citing Corsey v. Department of Corrections, 375 So. 2d 1319, 1321-22 (La. 1979)).

Thus, the "doctrine of contra non valentem recognizes that in limited circumstances prescription should not run if good cause exists as to why plaintiff would have been unable to exercise or was lulled into not exercising a cause of action when it first became exigible." Pracht v. City of Shreveport, 830 So.2d 546, 551 (La. App. 2d Cir. 2002).

The medical records indicate that Toney attacked Coleman on or before May 15, 2008, and Coleman confirmed that the date and other information in the medical records was accurate. However, he also testified that the attack occurred sometime in May or June 2008. It is clear from his own testimony that Coleman knew no later than June 30, 2008 of the existence of his injuries and the connection between those injuries and the claimed failures of defendants Warden Tanner, Deputy Warden Bickham and Classification Director McCloud to protect plaintiff from Toney's attack. Thus, Coleman asserts a failure to protect claim based upon an event that occurred more than one year before October 24, 2009, the date on which his complaint is deemed filed under the mailbox rule. Under these circumstances, his failure to protect claim must be dismissed due to expiration of the one-year statute of limitations.

13

Plaintiff has not asserted any cause or condition that prompts application of the doctrine of contra non valentem.  His complaint and testimony establish that, more than one year prior to his filing of the instant action, even under the liberal "mailbox rule," Coleman knew of defendants' allegedly unconstitutional failure to protect him from attack by Toney and his resulting injuries.  The record establishes no condition that might have tolled the statute of limitations or upon which the doctrine of contra non valentem might be applied.  In short, because plaintiff did not commence his failure to protect claim within the required one-year limitations period after he knew or should have known of the alleged constitutional violations, this claim under Section 1983 is time-barred and must be dismissed.

III.   <u>FAILURE TO PROTECT</u>

In addition to his prescribed claim that defendants failed to protect him from attack by Toney, Coleman alleges that defendants also have failed to protect him from harm because the inmates at Rayburn know that he cooperated with DOC officials' investigation of wrongdoing by correctional officers at other facilities.  He alleges that, as a result of their knowledge of his cooperation, other inmates threatened him and his food was poisoned while he was in administrative segregation.  Coleman's written submissions and his testimony both asserted that his requests to be placed in some sort of protective custody had been denied because prison officials found his claim was

14

"without merit" and they saw no need for protective custody, after they spoke to Toney and other inmates whom plaintiff had named in his requests for protection.

Coleman was a convicted inmate at the time of the events on which he bases his claims, so that the Eighth Amendment standard applies. Under the Eighth Amendment, prison officials have a duty to protect inmates from violence by other inmates and to take reasonable measures to protect their safety. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996). The Eighth Amendment standard enunciated in Farmer applies to a prisoner's claim that prison officials failed to protect him from harm inflicted by other inmates. Thus, prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm. Farmer, 511 U.S. at 834; Newton v. Black, 133 F.3d 301, 308 (5th Cir. 1998).

Only deliberate indifference, "an unnecessary and wanton infliction of pain or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 105-06 (1976); accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976). "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  Id. at 834 (quotation omitted).

Further, plaintiff must establish that the defendant possessed a culpable state of mind.  Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  "Mere negligence or a failure to act reasonably is not enough. The officer must have the subjective intent to cause harm."  Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003).  If the court finds that one of the components of the test is not met, it need not address the other component.  Davis, 157 F.3d at 1005.

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  The deliberate indifference standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (citing Board of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (additional citations and

footnote omitted) (emphasis added).  "'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference."  <u>Norton</u>, 122 F.3d at 291.

Whether a prison official had the requisite knowledge of a substantial risk is a question of fact.  <u>Farmer</u>, 511 U.S. at 837; <u>Newton</u>, 133 F.3d at 308.

> [If a] plaintiff presents evidence showing that a substantial risk of . . . attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

<u>Farmer</u>, 511 U.S. at 842-43.

Not every injury suffered by a prisoner at the hands of another, however, rises to the level of a constitutional violation.  <u>Id.</u> at 834.  Nor are prison officials "expected to prevent all inmate-on-inmate violence."  <u>Adames v. Perez</u>, 331 F.3d 508, 513 (5th Cir. 2003) (citing <u>Farmer</u>, 511 U.S. at 834).  Thus, in <u>Adames</u>, the United States Court of Appeals for the Fifth Circuit vacated and remanded a jury verdict in favor of an inmate, holding that evidence of <u>isolated</u> previous attacks was insufficient to show deliberate indifference to an inmate's safety or to support a jury's verdict that prison officials failed to protect the inmate.

In this case, it cannot be concluded that prison officials unconstitutionally exposed plaintiff to a substantial risk of serious harm.  Coleman's own testimony and his

complaint confirm that prison officials investigated his allegations by speaking to Toney and other inmates whom plaintiff had named.  However, they found no merit in his contention that other inmates posed any danger to him as a result of his alleged prior cooperation with DOC officials.  A prison official's mere knowledge of vague threats against an inmate is <u>not</u> sufficient to make it clear to the official that such information presents a substantial risk of serious harm to the inmate.  <u>Santiago v. Walls</u>, No. 07-1219, 2010 WL 1170654, at *5 (7th Cir. Mar. 29, 2010); <u>Armstrong v. Price</u>, 190 Fed. Appx. 350, 2006 WL 1815083, at *2 (5th Cir. 2006); <u>see also</u> <u>Klebanowski v. Sheahan</u>, 540 F.3d 633, 639-41(7th Cir. 2008) ("The facts of this case make clear our reason for requiring more than general allegations of fear or the need to be removed.  By [plaintiff's] own testimony, the officers knew only that he had been involved in an altercation with three other inmates, and that he wanted a transfer because he feared for his life. . . .  Without these additional facts [concerning subsequent threats] to rely on, there was nothing leading the officers to believe that [plaintiff] himself was not speculating regarding the threat he faced out of fear based on the first attack he suffered.  This lack of specificity falls below the required notice an officer must have for liability to attach for deliberate indifference.").  Thus, prison officials in the instant case had no reason to suspect that any inmate posed any known or anticipated threat of serious harm to Coleman.

18

Plaintiff's testimony in this regard, even if accepted as true in its entirety for present purposes, does not allege actions by prison officials that rise to the level of deliberate indifference to a known risk of substantial harm, as required to establish a constitutional violation.  Plaintiff's own testimony confirms the information in his complaint that prison officials acted promptly to investigate his complaints, but found them to be meritless.  He admitted in his testimony that he had <u>not</u> been attacked by anyone since the attack by Toney.  In similar circumstances, including when the inmate reiterated to prison officials the same threats that the officials had already investigated by interviewing the allegedly involved persons, the Fifth Circuit has held that officials did not know of and disregard an excessive risk to inmate health or safety.  <u>Armstrong</u>, 2006 WL 1815083, at *2-3; <u>see also</u> <u>Hipp v. Manning</u>, 42 F.3d 641, 1994 WL 708812, at *2 (5th Cir. 1994) (no deliberate indifference when prison officials denied inmate's request for protective custody after investigating his allegations of threats by two inmates whom he did not identify, and he was later attacked by a different inmate for a different reason).  Moreover, a prison official's mere knowledge that an inmate is a "snitch" or has been involved in a physical altercation once before is insufficient to show that the official either could or did infer that the inmate was at substantial risk of serious harm.  <u>Adames</u>, 331 F.3d at 513, 514-15.

19

As to plaintiff's allegation that his food was poisoned while he was in administrative segregation, he has provided no factual details to support this conclusory allegation. Coleman does not say when or for how long the alleged poisoning occurred, who tampered with his food, what type of "poison" was introduced, how the adulteration occurred or how he was harmed by the alleged tampering. "Although pro se complaints and arguments must be liberally construed, a plaintiff in a 42 U.S.C. § 1983 action must plead specific facts, not 'conclusory allegations.'" Taylor v. Cockrell, 92 Fed. Appx. 77, 2004 WL 287339, at *1 (5th Cir. 2004) (citing Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994); Schultea v. Wood, 47 F.3d 1427, 1433 (5th Cir. 1995); Biliski v. Harborth, 55 F.3d 160, 162 (5th Cir. 1995); Arnaud v. Odom, 870 F.2d 304, 307 (5th Cir. 1989)). Coleman's "allegations have been and remain insufficient to establish that defendant officials were aware of facts from which an inference could be drawn that he faced a 'substantial risk of serious harm' from his fellow inmate[s]." Id. (citing Farmer, 511 U.S. at 837; Newton, 133 F.3d at 308).

In several instances, pro se actions brought by prisoners proceeding in forma pauperis under Section 1983 have been dismissed as frivolous when they asserted wholly conclusory, non-specific allegations. See, e.g., Biliski, 55 F.3d at 162 (conclusory claims of inadequate medical and dental care); Wilson v. Budney, 976 F.2d 957, 958 (5th Cir. 1992) (conclusory allegations of conspiracy); Dayse v. Schuldt, 894 F.2d 170, 172-73

20

(5th Cir. 1990) (plaintiff "wholly unable" to make fact-specific allegations of conspiracy). Coleman's allegation that his food was poisoned by an unnamed person on an unspecified date in some unspecified way, resulting in some unspecified harm, falls within that category of wholly conclusory, non-specific allegations.

Moreover, none of the documents in the court's record supports plaintiff's allegation that his food was poisoned and that defendants were deliberately indifferent to a serious risk of harm in that regard. One of the documents attached to Coleman's complaint is a September 21, 2009 letter to him from Assistant Warden Ronald Branch in response to plaintiff's allegations concerning his food. In the letter, Warden Branch stated that he had investigated, but could not substantiate, Coleman's allegations that someone had tampered with his food. Warden Branch described the prison's procedures and precautions for the mass preparation of inmate food trays and stated that no evidence supported plaintiff's allegations. Warden Branch also noted that Coleman had made sick call five times in the past 36 days and had been referred to a doctor to whom he could report any medical problem.

Plaintiff's medical records from Rayburn during the period after the attack by Toney, from about June 2008 until December 3, 2009 (when the records were provided to the court), reveal that, since his arrival at Rayburn in January 2008, Coleman was treated for chronic, intermittent abdominal pain, which became more frequent from

21

October 2008 until Coleman underwent a colonoscopy on February 5, 2009.  The physician who performed the colonoscopy diagnosed diverticulosis, an internal hemorrhoid and a benign rectal polyp, which was removed.  The medical records also show that plaintiff was treated during this period for asthma, chronic obstructive pulmonary disease, diabetes, ankle swelling, skin problems, sinus infections, jaw pain, dental problems and hypertension.  On April 1 and June 10, 2009, Coleman complained of abdominal pain, but his physical examination was normal.  He was given Metamucil and advised to lose weight and to exercise.  On July 25, 2009, a doctor reviewed Coleman's records for a chronic health clinic summary and noted that his condition had not significantly changed, but that he was not compliant with his medications.  On September 20, 2009, one day before Warden Branch's letter responding to plaintiff's complaint of poisoning, Coleman was treated with Pepto-Bismol and Tylenol for complaints of vomiting, abdominal bloating, sore throat and body aches.  He had similar complaints on October 7, 2009, when he was diagnosed with pharyngitis,[3] and given Maalox for his stomach.  There are no other medical notes regarding any complaints of or treatment for stomach ailments or any alleged poison in Coleman's food.

---

[3]Pharyngitis is an "inflammation of the mucous membrane and underlying parts of the pharynx." Stedman's Medical Dictionary (27th ed.), STEDMANS 310590, 2000 WL 33626567.  The pharynx is "the upper expanded portion of the digestive tube, between the esophagus below and the mouth and nasal cavities above and in front."  Id. STEDMANS 310850, 2000 WL 33626593.

Plaintiff suggested in his written submissions that his laboratory test results would show that he had been poisoned.  To the contrary, the doctors who examined him noted that, other than elevated blood levels of glucose and hemoglobin $A_{1c}$, which are both indicators of diabetes,[4] Coleman's lab test results on January 10, 11 and 12, July 25, and August 6, 2009 were within normal limits.  Thus, neither plaintiff's testimony, the documents attached to his complaint nor the medical records support his allegation that someone tampered with his food while he was in administrative segregation.

Prison officials had no reason to suspect that Coleman was at risk of serious harm from any inmate.  Therefore, defendants cannot be liable for failing to protect plaintiff because no finding of deliberate indifference required to state a constitutional claim is possible.  Accordingly, plaintiff's Section 1983 claim of failure to protect from harm by other inmates must be dismissed.

IV.   <u>NO PHYSICAL INJURY</u>

Plaintiff's claim is also deficient under Section 1983 because he fails to allege "physical injury" sufficient to support his claim for monetary damages.  Specifically, the Prison Litigation Reform Act of 1996 includes the following requirement in 42 U.S.C.

--------

[4]Hemoglobin is "the red oxygen-carrying pigment of erythrocytes," which are the red blood cells.  Hemoglobin A1c "levels are increased in poorly controlled diabetic patients." <u>Dorland's Illustrated Medical Dictionary</u> 618, 802-03 (29th ed. 2000).

§ 1997e(e):  "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury while in custody without a prior showing of physical injury."  (Emphasis added).  Coleman admitted that he was not attacked by anyone after the attack by Toney, and he did not allege any physical injury from the alleged food poisoning.

In recent decisions, the Fifth Circuit has consistently enforced the statutory physical injury requirement for prisoners who seek compensatory damages for intangible emotional or psychological harm, such as has been alleged by Coleman in this case. Hutchins v. McDaniels, 512 F.3d 193, 196 (5th Cir. 2007); Geiger v. Jowers, 404 F.3d 371, 374-75 (5th Cir. 2005); Herman v. Holiday, 238 F.3d 660, 665 (5th Cir. 2001).

The Fifth Circuit has explained that "[t]he 'physical injury' required by § 1997e(e) 'must be more than de minimus [sic], but need not be significant.'" Alexander v. Tippah County, 351 F.3d 626, 631 (5th Cir. 2003) (citing Harper v. Showers, 174 F.3d 716, 719 (5th Cir. 1999) (quoting Siglar, 112 F.3d at 193).  Thus, in Alexander, the court found that "[Section] 1997e(e) precludes [plaintiffs] from recovering for their emotional and mental injuries" when the only physical injuries they had suffered were nausea and one incident of vomiting.  Id.  Similarly, in Siglar, the court held that a prisoner's ear that was sore and bruised for three days was merely a de minimis injury.  Siglar, 112 F.3d at 193.

24

In this case, Coleman has not alleged any physical injuries of any kind as a result of the alleged constitutional violations.  As Section 1997e(e) provides and Fifth Circuit case law makes clear, he is precluded as a matter of law from recovering damages for the psychological or other emotional injury he has asserted.  Thus, plaintiff's complaint must be dismissed in this regard.

## V.   NO RIGHT TO TRANSFER

Insofar as plaintiff seeks transfer to "one of the State Detention Centers out of the Dept. of Corrections" or to "an undisclosed institution that would minimize the threats on [his] life, and restoration of his visits an[d] other privleges [sic]," Record Doc. No. 1, Complaint at pp. 12-13, it is clear that a prisoner has no right of any kind springing from the Constitution itself to be housed in any particular facility or to be transferred from one prison facility to another, even if life in one prison may be much more disagreeable than in another.  Olim v. Wakinekona, 461 U.S. 238, 245-46 (1983); Meachum v. Fano, 427 U.S. 215, 224-225 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976); Fuselier v. Mancuso, 354 Fed. Appx. 49, 2009 WL 3780729, at *1 (5th Cir. 2009) (citing Olim, 461 U.S. at 245; Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996)); Biliski, 55 F.3d at 162.

Constitutionally protected liberty interests may be created not only by the Constitution itself, however, but also by state law.  Not every state statute creates a liberty interest protected by the Constitution and cognizable under Section 1983.  On the

contrary, a state statute creates constitutionally protected interests only if it establishes that state officials must take mandatory, non-discretionary actions in connection with the life, liberty or property of citizens.  Olim, 461 U.S. at 249; Taylor v. Jagers, 115 Fed. Appx. 682, 2004 WL 2526373, at *1 (5th Cir. 2004) (citing Jackson v. Cain, 864 F.2d 1235, 1250 (5th Cir. 1989)); Lathers v. Nelson Coleman Corr. Ctr., No. 10-128, 2010 WL 1489903, at *3 (E.D. La. Mar. 22, 2010) (Shushan, M.J.), report & recommendation adopted, 2010 WL 1485468 (E.D. La. Apr. 13, 2010) (McNamara, J.).  Thus, state statutes that vest officials with broad discretion to carry out their official functions do not create constitutionally protected interests that may form the basis for an action under Section 1983.  See Olim, 461 U.S. at 249-50 (Hawaii prison regulations vesting prison administrators with broad discretion concerning inmate placement and transfers create no liberty interest protected under the Due Process Clause); Merit v. Lynn, 848 F. Supp. 1266, 1267-68 (W.D. La. 1994) (Louisiana parole statute is broadly discretionary and creates no constitutionally protected liberty interest).

In the instant case, Coleman's claim that he is entitled to be housed in a prison facility other than the Rayburn Correctional Center is governed by the related Louisiana statutes, La. Rev. Stat. § 15:566(B) and 15:824(B), which set forth the circumstances under which prisoners convicted of state criminal offenses are to be sent to DOC facilities from parish jails, and the myriad exceptions under which they may remain in

parish facilities.  These statutes vest extremely broad discretion in the DOC officials who are responsible for the placement of state prisoners.  As one Louisiana appellate court stated, in interpreting La. Rev. Stat. § 15:824 and vacating the order of a trial judge who attempted to require the DOC to remove convicted state prisoners from Orleans Parish Prison to a DOC facility,

> [t]his statute clearly envisions that the Department of Corrections <u>may be unwilling or unable</u> to take physical custody of prisoners sentenced to hard labor.  In such an event, the department is obligated to pay the local sheriff or jailer for the costs of keeping such a prisoner . . . . The legislature by these enactments has manifested a <u>clear intent to leave the physical placement of prisoners within the jurisdiction of the DOC alone</u>.

<u>State v. Sylvester</u>, 648 So. 2d 31, 33 (La. App. 4th Cir. 1994) (emphasis added); <u>accord</u> <u>Oglesby v. Gusman</u>, No. 09-3593, 2009 WL 3254145, at *3-4 (E.D. La. Oct. 7, 2009) (Vance, J.); <u>Andrews v. Belt</u>, No. 07-CV-1283, 2007 WL 3046130 (W.D. La. Oct. 2, 2007) (Kirk, M.J.), <u>aff'd</u>, 274 Fed. Appx. 359, 2008 WL 1747116 (5th Cir. 2008).

Thus, the State of Louisiana by its broadly discretionary statutes has <u>not</u> created a protected liberty interest in being housed in a particular prison or being transferred from the Rayburn Correctional Center to another facility.  Coleman has no constitutional right to be housed in a DOC prison or any particular facility, under either the Constitution or state law.  This claim is legally frivolous and fails to state a cognizable Section 1983 claim.

VI.   <u>RETALIATION</u>

Coleman asserts that he was subjected to disciplinary action in retaliation for his requests to prison officials for assistance or a transfer to protect him from harm by other inmates.   In his complaint, he alleged that he was placed into maximum security "disciplinary detention for . . . 16 calendar months for a 'fake' dirty urine in retaliation because [of] a request for protection and other various reasons."   Record Doc. No. 1, Complaint, at p. 2, ¶ 1.  Plaintiff admitted in his complaint that he "had to actually set myself up with contraband to stay in lockdown adm[inistrative] seg[regation,] hoping the worst happen[s], I be place[d] in maximum custody if found guilty of the infraction[,] which is what happen[ed]."  <u>Id.</u> at p. 9, ¶ 16.  Coleman testified that he has not been attacked again since he entered administrative segregation.   His complaint and the documents attached to his complaint indicate that he continued to file grievances and requests to be transferred after being placed in administrative segregation.

Plaintiff's allegations attempt to state a claim of retaliation for exercising his First Amendment right to use the prison grievance system.  Prison officials may not retaliate against a prisoner for exercising his First Amendment rights of access to the courts or to complain through proper channels about a guard's misconduct.  <u>Morris v. Powell</u>, 449 F.3d 682, 684 (5th Cir. 2006); <u>Woods v. Smith</u>, 60 F.3d 1161, 1164 (5th Cir. 1995).

The law in the Fifth Circuit concerning prisoner retaliation claims has undergone substantial evolution in recent years.  It is based on the following general principles:

> The elements of a retaliation claim are the invocation of a specific constitutional right, the defendants' intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, i.e., but for the retaliatory motive the complained of incident . . . would not have occurred.  With respect to the last element, we [have] emphasized that an action motivated by retaliation for the exercise of a constitutionally protected right is actionable even if the act, when taken for a different reason, may have been legitimate.

Clarke v. Stalder, 121 F.3d 222, 231 (5th Cir. 1997), vacated in part and reinstated in relevant part, 154 F.3d 186 (5th Cir. 1998) (citing Bounds v. Smith, 430 U.S. 817 (1977); Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997); Woods, 60 F.3d at 1164-66) (quotations and additional citations omitted).

In Woods, the Fifth Circuit, applying the general First Amendment principles addressed above, affirmed the district court's denial of defendants' motion for summary judgment.  Defendants in that case had sought dismissal of a prisoner's claim based on allegedly false disciplinary charges by defendants in alleged retaliation for plaintiff's letters of complaint to a federal judge and to the warden of the prison.  The Fifth Circuit agreed that the inmate's retaliation claim should be permitted to proceed, but in doing so it expressed the following caution:  "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.

29

Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." Woods, 60 F.3d at 1166 (citation and quotation omitted).  The Fifth Circuit warned that "trial courts must carefully scrutinize these claims."  Id.

> To state a claim of retaliation <u>an inmate must allege the violation of a specific constitutional right</u> and be prepared to establish that but for the retaliatory motive the complained of incident . . . would not have occurred. This places a significant burden on the inmate . . . .  The inmate must produce direct evidence of motivation or, the more probable scenario, "allege a chronology of events from which retaliation may plausibly be inferred."

Id. (citations omitted) (emphasis added).

A year later, the United States Supreme Court reexamined the scope of prisoners' First Amendment right of access to the courts in <u>Lewis v. Casey</u>, 518 U.S. 343 (1996). The Supreme Court made clear in <u>Lewis</u> that an inmate <u>must establish actual injury</u> to state a claim for denial of his right of access to the courts.  <u>Id.</u> at 349-50.

Recently in <u>Morris</u>, a case of first impression in the Fifth Circuit, the court addressed "[w[hether an allegation of <u>de minimis</u> retaliatory acts can support a retaliation claim" under the First Amendment.  <u>Morris</u>, 449 F.3d at 684.  The court stated that

> [t]he question, however, is not whether the violation of [plaintiff's] constitutional rights was <u>de minimis,</u> but whether any violation occurred at all.  To establish a constitutional violation, an inmate must show that he suffered a qualifying adverse retaliatory act.  If the retaliation alleged by [plaintiff] does not pass this bar, he has suffered no constitutional injury.

30

Id.  The Fifth Circuit held that

> [t]he purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights.  Some acts, though maybe motivated by retaliatory intent, are so de minimis that they would not deter the ordinary person from further exercise of his rights.  Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim.
> . . . .  Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights. . . .
> With this standard in mind, we turn to the specific retaliation alleged by [plaintiff] to determine whether the actions of the [prison] officials would have deterred a person of ordinary firmness from exercising his First Amendment right to file grievances against prison officials.

Id. at 686 (citing Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998)).

The Fifth Circuit's reasoning and rulings in Morris accord with the Supreme Court's holding in Lewis that a prisoner who brings a retaliation claim under the First Amendment must allege actual injury in order to assert a claim.  Furthermore, the alleged retaliatory acts must be more than de minimis, which means they must be capable of deterring a person of ordinary firmness from further exercising his constitutional rights.

Thus, the law in the Fifth Circuit

> is well established that prison officials may not retaliate against an inmate who exercises his right of access to court.  Officials likewise may not retaliate against an inmate for using the grievance system.  A plaintiff must allege facts showing that the defendant possessed a retaliatory motive.  The inmate must show more than his personal belief that he was the victim of retaliation.  Mere conclusory allegations of retaliation are not enough.  In

order to proceed on his claims, a plaintiff must show that the retaliatory adverse act [was] more than a de minimis act.

Decker v. McDonald, No. 5:09cv27, 2010 WL 1424322, at *15 (E.D. Tex. Jan. 11, 2010), report & recommendation adopted, 2010 WL 1424292 (E.D. Tex. Apr. 7, 2010) (citing Morris, 449 F.3d at 687; Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999); Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997); Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988); Whittington v. Lynaugh, 842 F.2d 818, 820 (5th Cir. 1988); Hilliard v. Board of Pardons & Paroles, 759 F.2d 1190, 1193 (5th Cir. 1985); Ruiz v. Estelle, 679 F.2d 1115, 1153 (5th Cir.), amended in part and vacated in part, 688 F.2d 266 (5th Cir. 1982); Campbell v. Beto, 460 F.2d 765, 768 (5th Cir. 1972).

The Fifth Circuit has upheld dismissals of retaliation claims based on allegedly false disciplinary charges when the inmate either admitted or was found guilty of having committed the disciplinary infraction.  Sylvester v. Cain, 311 Fed. Appx. 733, 2009 WL 423968, at *2 (5th Cir. 2009); Cross v. Dretke, 241 Fed. Appx. 203, 2007 WL 2110728, at *1 (5th Cir. 2007); Reeves v. Wood, 206 Fed. Appx. 368, 2006 WL 3337451, at *1 (5th Cir. 2006); Brown v. Craven, 106 Fed. Appx. 257, 2004 WL 1730128, at *1-2 (5th Cir. 2004).

In the instant case, Coleman admitted that he "set myself up with contraband to stay in lockdown adm[inistrative] seg[regation,] hoping the worst happen[s], I be place[d]

in maximum custody if found guilty of the infraction[,] which is what happen[ed]."

Because he admits being guilty of the infraction for which he was found guilty, Coleman

cannot show either a retaliatory motive for the disciplinary action or that, but for a

retaliatory motive, the disciplinary action would not have occurred. See also Leggett v.

Comer, 280 Fed. Appx. 333, 2008 WL 2094411 (5th Cir. 2008) (retaliation claim was

frivolous when plaintiff failed to show that "his property would not have been missing

but for his letter-writing about [prison] officials, and [that] retaliatory intent motivated

the lack of adequate inventories and storage of his property"); Brown, 2004 WL

1730128, at *1 ("Because items that cannot be shown to have a legitimate source are

considered contraband, Brown cannot show that, but for the alleged retaliatory motive,

his undocumented 'contraband' would not have been seized during a routine cell

search.").

Coleman's retaliation claim in this case alleges no violation of a specific

constitutional right as a result of any allegedly retaliatory acts.  He has not shown the

existence of either a retaliatory motive or causation.  In addition, he suffered no actual

injury as a result of being placed in administrative segregation based on a finding that he

was guilty of the disciplinary charge for which he admits that he was actually guilty.

Accordingly, his retaliation claim is legally frivolous and fails to state a claim upon

which relief can be granted under Section 1983.  It must be dismissed pursuant to 28 U.S.C. § 1915(e).

VII.   <u>STATE LAW CLAIMS</u>

In the absence of a cognizable federal claim, any claims asserted by plaintiff that would constitute negligence under state law and the assault and battery claims asserted in his complaint, to whatever extent they survive his testimony that he does not bring these claims, are not within this court's supplemental subject matter jurisdiction.  If my recommendation to dismiss plaintiff's Section 1983 claims is accepted by the presiding district judge, plaintiff will have no federal claims remaining in this action, and the court will have no supplemental jurisdiction over his state law claims.  28 U.S.C. § 1367(a).

A district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  <u>Id.</u> § 1367(c)(3).  The "general rule" in the Fifth Circuit "is to decline to exercise jurisdiction over pendent state law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial."  <u>Batiste v. Island Records, Inc.,</u> 179 F.3d 217, 227 (5th Cir. 1999) (citation omitted); <u>accord</u> <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the

34

remaining state-law claims"); <u>Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.</u>, 554 F.3d 595, 602 (5th Cir.), <u>cert. denied</u>, 129 S. Ct. 2865 (2009).

In the instant case, no trial date has been set and the parties have not yet commenced discovery. These proceedings remain at the earliest screening stage for pro se and in forma pauperis complaints. No possible basis for federal subject matter jurisdiction is apparent from the face of this complaint. Accordingly, pursuant to Section 1367(c) and having balanced the relevant factors of judicial economy, convenience, fairness, and comity, the court should decline to exercise jurisdiction over Coleman's state law claims and dismiss them without prejudice for all purposes contemplated by 28 U.S.C. § 1367(d). <u>Mendoza v. Murphy</u>, 532 F.3d 342, 347 (5th Cir. 2008); <u>Brim v. ExxonMobil Pipeline Co.</u>, 213 Fed. Appx. 303, 2007 WL 62866, at *1 (5th Cir. 2007); <u>Smith v. Amedisys Inc.</u>, 298 F.3d 434, 447 (5th Cir. 2002).

## <u>RECOMMENDATION</u>

For all of the foregoing reasons, it is **RECOMMENDED** that plaintiff's Section 1983 complaint be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1), and that his state law negligence, assault and battery claims be **DISMISSED WITHOUT PREJUDICE.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[5]

New Orleans, Louisiana, this __27th__ day of April, 2010.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[5]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.